UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

VICTORIA OPINCA, A/K/A
"NATALIA KOSTINA,"
"NATALIA ZUEVA,"

                Defendant.

------------------------------------X

10 Cr. 1287-01 (RWS)

SENTENCING OPINION

Sweet, D.J.

        On December 21, 2010, Victoria Opinca, a/k/a "Natalia Kostina," a/k/a "Natalia Zueva," ("Opinca" or "Defendant") pleaded guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. For the reasons set forth below, Opinca will be sentenced to 4 months' imprisonment to be followed by three years' supervised release. Opinca will also be required to pay restitution and forfeit the amount of $21,800 and a special assessment of $100.

## Prior Proceedings

        On December 21, 2010, Information 10 CR 1287-01 (RWS)

1

was filed in the Southern District of New York.  Count 1 charges
that from June 2010, up to and including August 4, 2010, in the
Southern District of New York and elsewhere, Opinca and others
known and unknown, unlawfully conspired to execute a scheme and
artifice to defraud a financial institution, the deposits of
which were then insured by the Federal Deposit Insurance
Corporation by means of false and fraudulent pretenses,
representations and promises, in violation of 18 U.S.C. § 1344
and § 1349.

On December 21, 2010, Opinca appeared before the
Honorable Kevin N. Fox in the Southern District of New York and
allocuted to Count 1 pursuant to a plea agreement.

The Court received a letter from Defendant's counsel,
dated January 20, 2011, requesting that Court be lenient when
imposing a sentence in light of Opinca's personal circumstances
and minor role in the offense.  Attached to her counsel's
January 20, 2011 letter was a letter from Defendant and
accompanying character letters.

Opinca's sentencing is currently scheduled for January
25, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

        (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)   the kinds of sentences available;

    (4)   the kinds of sentence and the sentencing range established for —

> (A)  the applicable category of offense committed
>       by the applicable category of defendant as
>       set forth in the guidelines . . .;
>
> (5)  any pertinent policy statement . . . [issued
>      by the Sentencing Commission];
>
> (6)  the need to avoid unwarranted sentence
>      disparities among defendants with similar
>      records who have been found guilty of
>      similar conduct; and
>
> (7)  the need to provide restitution to any victims of
>      the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.  See Crosby, 397 F.3d at 114-15.


**The Defendant**


The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Opinca's personal and family history.


**The Offense Conduct**


The following description draws from the PSR.  The specific facts of the underlying conduct are adopted as set

4

forth in that report.

Opinca, Dorin Codreanu, a/k/a "Savvas Paian," ("Codreanu"), and Alina Turuta, a/k/a "Inna Rogova," a/k/a "Anna Aniskina," ("Turuta"), and others participated in a scheme to defraud banks and business in the United States of at least $3 million.

The fraudulent scheme had two components. First, computer hackers located in Eastern Europe used a malicious computer program to obtain access to the bank accounts of small and mid-sized businesses and municipal entities in the United States (the "Victim Accounts"). The malicious program, known as the "Zeus Trojan" or "Zeus Virus," was designed to steal computer access data, such as usernames and passwords, for, among other things, bank accounts, e-mail accounts, and social networking websites. The Zeus Trojan typically infects a victim's computer when the victim clicks on a link, or opens a file, that is attached to a seemingly legitimate e-mail message (known as a "phishing attack"), but which is actually an e-mail message sent by computer hackers for the purpose of infecting the victim's computer. Once installed, the Zeus Trojan allows computer hackers to secretly monitor the victim's computer

5

activity, recording, among other things, the victim's bank account numbers, passwords, and authentication information as they are typed by the victim into the infected computer to access online banking websites, among other things.  The stolen bank account data is then used to fraudulently transfer funds out of the Victim Accounts.   The Zeus Trojan has compromised dozens of Victim Accounts.

          In addition, individuals, known as "money mules" or "mules," were recruited to open bank accounts in the United States, often with fake passports, but sometimes under their own names (the "Mule Accounts"), to receive fraudulent wire transfers from the Victim Accounts.   Once the wire transfers were received in the Mule Accounts, the mules withdrew the fraudulently-acquired funds and distributed them to other members of the conspiracy, keeping a portion for themselves.

          A group of individuals in Eastern Europe and in the United States (the "Mule Organization") recruited the money mules to open Mule Accounts in the United States, into which funds were fraudulently wired from the Victim Accounts.   The Mule Organization typically recruited mules from Eastern Europe who were either planning to travel to, or were already present

in, the United States on J1 visas.  J1 visas are non-immigrant
visas that allow foreigners to visit the United States.  One
program offered by the U.S. Department of State allows foreign
students to visit the United States during the summer to, among
other things, work, travel, and gain cultural experience.

Once in the United States, the organizers of the Mule
Organization provided the mules with fake foreign passports,
which the mules used to open bank accounts at various banks (the
"Mule Accounts").  Anywhere from several days to several weeks
after the Mule Accounts were opened, other participants in the
fraudulent scheme used stolen account information to transfer
money from the Victim Accounts to the Mule Accounts, typically
in amounts close to $10,000.  Once the transfers were complete,
the mules quickly withdrew the money from the Mule Accounts
before the fraud could be detected by the victims or the banks.
The mules kept a portion of the fraudulent proceeds for
themselves - usually eight to ten percent - and transferred the
rest to other participants in the fraudulent scheme.  Mules
working for the Mule Organization have opened hundreds of Mule
Accounts.

In May 2010, Opinca, and Turuta entered the United States on a U.S. J1 visa with expectation of legitimate employment. Upon arrival, they learned that they would not be offered full-time work as expected. Opinca, then contacted Codreanu, whom Opinca knew from Moldova via a Russian social networking website, for assistance with employment. Opinca subsequently met with Codreanu who offered Opinca a job that entailed opening accounts and then waiting for calls to withdraw funds from the accounts. Codreanu informed Opinca that she would be able to keep ten percent of the money she withdrew, but that she could not tell anyone else about the job. After several days, Opinca decided to accept the job. Several days after that, Opinca introduced Turuta to Codreanu. After meeting Turuta, Codreanu presented the same job involving the opening of bank accounts to Turuta, who also accepted after considering the offer for several days.

Subsequently, Codreanu informed Opinca, that Opinca could earn more money if she agreed to open accounts using a passport with a new identity. Opinca agreed to do so and was subsequently given two Greek passports with two different names. Opinca used the passports to open accounts at several banks, including Bank of America and TD Bank.

8

Opinca's Fraudulent Account Activity

On June 22, 2010, Opinca opened an account with the account number ending in 003, in the name of "Victoria Opinca," at JPMorgan Chase Bank ("Chase") (the "Opinca/Chase Account"). Opinca was the sole account signatory. As proof of identity, Opinca presented a Republic of Moldova ("Moldova") passport with an identification number ending in 937 and with her photograph. On July 6, 2010, approximately $12,740 was wire transferred to the Opinca/Chase Account from an entity in Michigan ("Victim-1").

On July 10, 2010, Opinca made two withdrawals from the Opinca/Chase Account from two separate Chase branches, in the amounts of approximately $5,000 and $6,900, respectively. Victim-1 had not authorized the transfer of $12,740 into the Opinca/Chase Account.

On July 9, 2010, the Opinca/Chase Account received a wire transfer of approximately $12,310 from an entity in Illinois ("Victim-2"). Victim-2 had not authorized that transfer.

9

On July 19, 2010, Opinca, purporting to be "Natalia Kostina" opened an account in that name at a TD Bank branch in Forest Hills, New York (the "Kostina/TD Bank Account").   As proof of identity, "Natalia Kostina" presented a Greek passport with an identification number ending in 368 (the "Kostina Greek Passport").   Agents compared surveillance photographs from TD Bank of "Natalia Kostina" opening the Kostina/TD Bank Account, with the surveillance photographs from Chase of Opinca, and they appeared to be the same person.

On July 19, 2010, the date that the Kostina/TD Bank Account was opened, Opinca, purporting to be "Natalia Kostina" opened an account at a Bank of America ("BoA") branch in Forest Hills, New York ("Kostina/BoA Account"), using the Kostina Greek Passport as proof of identity.   Agents compared the surveillance photographs of "Natalia Kostina" opening the Kostina/BoA Account, with the surveillance photographs from Chase of Opinca, and they appeared to be the same person.

On July 21, 2010, Opinca, purporting to be "Natalia Zueva" opened an account with the account number ending in 810

10

at a TD Bank branch in New York, New York (the "Zueva/TD Bank Account").     As   proof   of   identification,   "Natalia   Zueva" presented a Greek passport with an identification number ending in 306 (the "Zueva Greek Passport").   TD Bank's surveillance photo of "Natalia Zueva" opening the account showed that she was in fact Opinca.

On July 21, 2010, Opinca, purporting to be "Natalia Zueva" opened another account at BoA using the Zueva Greek Passport (the "Zueva/BoA Account").     Agents   compared   the signatures on the signature cards for the Zueva/TD Bank Account and Zueva/BoA Account, and they appeared to be same.

All of the accounts described above that were opened by Opinca, a/k/a "Natalia Kostina," a/k/a "Natalia Zueva," were Mule Accounts that were used, or intended to be used, to receive and subsequently to transfer stolen funds from Victim Accounts.

At all relevant times the deposits at TD Bank, Bank of America and Chase were insured by the Federal Deposit Insurance Corporation ("FDIC").

The Arrest of Opinca, Turuta, and Codreanu

11

On August 4, 2010, Opinca and Turuta were arrested together at Chase by the Lyndhurst, New Jersey Police Department on suspicion of identity theft. At the time of arrest, Opinca was in possession of the Zueva Greek Passport. They also had an aggregate of $10,000 in U.S. currency. Opinca made her initial court appearance on September 30, 2010, and was remanded at that time.

Dorin Codreanu was arrested on November 18, 2010.

**The Relevant Statutory Provisions**

Pursuant to 18 U.S.C. §§ 1344 and 1349, the maximum term of imprisonment is 30 years.

A term of supervised release of up to five years is authorized for a B felony, pursuant to 18 U.S.C. § 3583(b)(1).

Defendant is not eligible for probation because the instant offense is a B felony for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(a).

12

The maximum fine that may be imposed is $1 million, pursuant to 18 U.S.C. § 1344.  A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

As a result of committing the offenses alleged in Count 1 of the Information, Defendant shall forfeit to the United States, pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2), and (a)(3), all property real and personal, involved in the offense or traceable to such property.

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).  The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

The guideline for a violation of 18 U.S.C. § 1349 is found in § 2X1.1, which directs that the guidelines for the underlying offense (18 U.S.C. § 1344) be utilized.    The

13

guideline for the underlying offense is found in § 2B1.1 which provides for a base offense level of 7 pursuant to § 2B1.1(a)(1).

As Defendant is responsible for a loss of $21,800, the offense level is increased by 4 levels pursuant to § 2B1.1(b)(1)(C), as the loss was more than $10,000, but less than $30,000. A further increase of 2 levels is warranted because a substantial part of the fraudulent scheme was committed from outside the United States and the offense involved sophisticated means, pursuant to § 2B1.1(b)(9)(B).

Based on the defendant's plea allocution, we believe that the defendant has shown recognition of responsibility for the offense. Pursuant to § 3E1.1(a), the offense is reduced two levels.

Accordingly, the applicable offense level is 11.

According to the FBI and the New York State Division of Criminal Justice Services, Bureau of Identification, Opinca has no prior criminal convictions. With no known criminal convictions, Defendant has zero criminal history points and a

14

Criminal History Category of I.

Based on a total offense level of 11 and a Criminal History Category of I, the Guidelines range for imprisonment is 8 to 14 months. The minimum term of imprisonment may be satisfied by: (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention, provided that at least one month is satisfied by imprisonment, pursuant to § 5C1.1(c); or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment.

The Guidelines range for a term of supervised release is three to five years, pursuant to § 5D1.2(a)(1).

Defendant is not eligible for probation because the instant offense is a B felony for which probation has been expressly precluded by statute, pursuant to § 5E1.1(b)(1).

The fine range for the instant offense is $2,000 to $1 million, pursuant to § 5E1.2(c)(3)(A) and (c)(4). Subject to

Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,270.93 to be used for imprisonment, a monthly cost of $317.32 for supervision, and a monthly cost of $2,063.19 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines

16

sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant" when determining a sentence. The Court recognizes that Defendant played a minor, though not insignificant, role in what appears to be an international criminal scheme.

Furthermore, based on defense counsel's January 20, 2011 letter and accompanying character letters, the Court considers that Defendant is a "well-liked" person who has a history of good behavior, and whose misconduct here appears to be an "aberration". Def. Letter at 2.

**The Sentence**

For the instant offense, Opinca will be sentenced to 4 months' imprisonment and 3 years' supervised release.

Opinca is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence her term of supervised release. It is recommended that

17

Opinca be supervised by the district of her residence.

As mandatory conditions of her supervised release, Opinca shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer. The mandatory drug testing condition is suspended due Defendant's low risk of future illicit drug use.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

Defendant shall provide the probation officer with access to any requested financial information.

Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the installment payment schedule.

Defendant shall obey the immigration laws and comply

18

with the directives of immigration authorities.

Defendant shall submit her person, residence, place of business, vehicle, or any other premises under her control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of her release may be found.   The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

A special assessment of $100, payable to the United States, is mandatory and shall be due immediately.

Defendant shall forfeit her interest in $21,800 to the United States.

An Order of Restitution will be delayed for up to 90

19

days after the sentence is imposed in anticipation of receiving the necessary identifying information from the Government pursuant to the provisions of 18 U.S.C. § 3664(d)(5).

The terms of this sentence are subject to modification at the sentencing hearing scheduled for January 25, 2011.

It is so ordered.

New York, NY
January 2*), 2011

ROBERT W. SWEET
U.S.D.J.